ace

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **LARRY SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No. 05-2105-JAR** |
| **CENTURY CONCRETE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Larry Smith, brings this action against his former employer, Century Concrete, Inc., alleging claims of hostile work environment, retaliation, and racial discrimination under Title VII.  This matter comes before the Court on defendant's motion for summary judgment (Doc. 23).  The motion is fully briefed, and the Court is prepared to rule.  For the reasons stated below, the Court grants in part and denies in part defendant's motion.

## I.      Plaintiff's Affidavit

Before discussing the uncontroverted facts in this case, the Court must address whether it should consider plaintiff's affidavit that he submitted as an attachment to his memorandum in opposition to defendant's summary judgment motion.[1]  This affidavit contains assertions that conflict with plaintiff's deposition testimony.  In its reply, defendant objects to plaintiff's reliance on the facts presented in this affidavit.  Defendant takes issue with plaintiff's statements

_____

[1](Doc. 25; Ex. 10.)

in his affidavit to the extent that he is alleging that more racial incidents occurred than what was established by plaintiff's deposition testimony.  For example, in his affidavit, plaintiff claims that his supervisor referred to African Americans as "those people"on a regular basis.[2]  However, in plaintiff's deposition testimony and his corresponding notes, plaintiff alleged that his supervisor made such a comment on only one occasion.  He goes on to allege in his affidavit that his supervisor called him a "nigger lover" that day;[3] however, plaintiff has never previously alleged that Thornton used this racial epithet.[4]  When plaintiff was asked if there were any other racial incidents that occurred during his employment, plaintiff stated that his deposition testimony "pretty much sums it up."[5]

Fed. R. Civ. P. 30(e) permits non-material changes to deposition testimony, as well as those material changes that satisfy the test adopted by the Tenth Circuit in *Burns v. Board of County Commissioners of Jackson County, Kansas*.[6]  In *Burns*, the court held that Rule 30(e) changes should be evaluated under the sham affidavit analysis articulated in *Franks v. Nimmo*.[7] The court reviewed the factors to consider when determining whether to permit Rule 30(e) changes, which include "'whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or

---

[2](Doc. 25; Ex. 10 at 3.)

[3](Doc. 25; Ex. 10 at 5.)

[4]The Court notes that it seems unlikely that plaintiff would forget his supervisor's use of such a flagrant racial epithet.

[5](Doc. 24; Ex. 1 at 12.)

[6]330 F.3d 1275 (10th Cir. 2003).

[7]796 F.2d 1230 (10th Cir. 1986).

whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.'"[8]  A change is material if it bears on an essential element of a claim or defense.[9]  Plaintiff's statements in these affidavits are not the type of alterations to deposition testimony that are allowed under Fed. R. Civ. P. 30(e).  In this case, plaintiff's counsel was present at his deposition, and plaintiff was subject to cross-examination.  Also, the Court concludes that the changes set forth in the affidavit are not based on newly discovered evidence.  Further, after reviewing plaintiff's deposition answers and his statements in his affidavit, the Court concludes that the testimony does not reflect any confusion by plaintiff that would justify material alteration.  Therefore, the corrections to plaintiff's testimony as presented in his affidavit will not be considered, and the Court will exclude such statements in the summary judgment analysis below.

## II.      Uncontroverted Facts

Plaintiff is a white male and is married to an African American female.  Plaintiff and his wife have biracial children.  Plaintiff was employed by defendant as a driver of a concrete truck between April 4, 2004 and September 24, 2004.  In late July 2004, a new plant manager, Matt Thornton, began supervising plaintiff.  Plaintiff contends that he initially got along well with Thornton.  However, plaintiff maintains that their relationship changed when Thornton learned that plaintiff is married to an African American woman.

The first incident of which plaintiff complains occurred when Thornton asked plaintiff where he lived.  When plaintiff told him his address, Thornton allegedly replied that a "bunch of

---

[8]*Burns*, 330 F.3d at 1282 (quoting *Franks*, 796 F.2d at 1237).

[9]*See Adler v. WalMart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

niggers" live around there.  Plaintiff responded that he did not appreciate Thornton's comments because his wife is African American.  Two days later, plaintiff contends that Thornton told him that he had never met an intelligent black person in his life.  Later that same day, plaintiff alleges that he was treated more harshly than the other employees when Thornton told plaintiff to "get a fucking shovel and get [his] ass under the plant and start shoveling."  At this time, plaintiff's work duties had been restricted due to a shoulder injury.  When plaintiff told Thornton of his restrictions, Thornton allegedly told him to "use his other fucking arm" to shovel.  Plaintiff also testified, however, that shoveling was a duty that all employees were required to do every now and then when rocks would build up underneath the plant.  A team of three or four workers would shovel the rocks into wheelbarrows and clean up the area underneath the plant.

That same day plaintiff reported Thornton's comments to Jay Raccuglia, a superior to Thornton.  Raccuglia told plaintiff that he would take care of the problem.  The following day, plaintiff alleges that Thornton starting mocking Matt Hamilton, an African American co-worker. Plaintiff contends that Thornton said to plaintiff, "How do you understand those people?"  On the same day, but after this mocking incident, plaintiff saw Raccuglia speaking with Thornton. Upon speaking with Thornton, Raccuglia told plaintiff of his conversation with Thornton and stated that things should get better.  Plaintiff testified that after this conversation, Thornton did not use any more racial epithets.

The following week, plaintiff reports that he was late for work by about twenty minutes. Plaintiff alleges that Thornton approached him and used abusive language.  Plaintiff contends that Thornton stated, "when I fucking tell you to be here at a certain time, you better have your ass here."  Afterwards, plaintiff reported Thornton's comments to Raccuglia, who told plaintiff

that he would deal with Thornton's inappropriate behavior.

The next week, plaintiff was selected, along with another co-worker named Bill Cox, to participate in a random urine analysis.  Plaintiff contends that Thornton verbally abused the two men in the presence of a woman conducting the urine analysis.  Plaintiff alleges that Thornton told them to "fucking take a piss" and to "stop playing fucking games."  Plaintiff reported Thornton's conduct to Raccuglia that same day, and Raccuglia stated that he would look into the incident.

Before plaintiff quit his employment with defendant, plaintiff worked with Thornton for approximately seven weeks.  During this seven-week period, plaintiff did not observe any racially offensive conduct during the first two weeks.  During this same seven-week period, plaintiff was on leave for about three weeks due to a work related injury.  Therefore, plaintiff was subject to Thornton's alleged comments for approximately two to three weeks.  After quitting his employment with the defendant, plaintiff began working for LaFarge where he is now earning $20.75 per hour.  Plaintiff now brings this action against his former employer asserting claims of hostile work environment, retaliation, and racial discrimination in violation of Title VII.

## III.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[10]  A fact is only material under this standard if a dispute over it would effect the

---

[10]Fed. R. Civ. P. 56(c).

outcome of the suit.[11]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[12]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[13]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[14]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[15]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[16]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[17]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[18]

## IV.  Analysis

### A.   Associational Discrimination

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any

---

[11]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[12]*Id.*

[13]*Id.* at 251-52.

[14]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[15]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[16]*Id.*

[17]*Id.*

[18]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."[19]  In this case, plaintiff, a white man, alleges that he suffered discrimination based on his marriage to an African American woman.  As a threshold matter, defendant correctly informs the Court that there are no cases in the Tenth Circuit in which a plaintiff has successfully brought a Title VII case based on associational discrimination.[20]  However, several other federal courts have recognized Title VII actions based on associational discrimination when a plaintiff alleged discrimination because of his or her interracial marriage.[21]  For example, the Eleventh Circuit has found that "[w]here a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race. It makes no difference whether the plaintiff specifically alleges in his complaint that he has been discriminated against because of *his* race."[22]  Accordingly, the Court finds in this case that plaintiff has successfully alleged a cause of action under Title VII by claiming that he faced discrimination because of his interracial marriage.

### B.    Hostile Work Environment

To survive summary judgment on a hostile work environment claim, plaintiff must

---

[19]42 U.S.C. § 2000e-2(a)(1).

[20]The Court notes, however, that the Tenth Circuit has recognized that a plaintiff may state a cause of action under 42 U.S.C. § 1981 for associational discrimination.  *See Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989).

[21]*See e.g., Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986); *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996); *Chacon v. Ochs*, 780 F. Supp. 680, 682 (C.D. Cal. 1991); *Gresham v. Waffle House, Inc.*, 586 F. Supp. 1442, 1445 (D. Ga. 1984); *Holiday v. Belle's Rest.*, 409 F. Supp. 904, 908 (D. Pa. 1976).  *See also Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.*, 173 F.3d 988, 994 (6th Cir. 1999) (finding that plaintiff had stated a claim under Title VII when he alleged that he was discharged from his employment for having a biracial child).

[22]*Parr*, 791 F.2d at 892.

7

establish "that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and (2) the harassment was racial or stemmed from racial animus."[23]  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview."[24]  "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."[25]

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated."[26]  The Supreme Court has recently again stated: "Title VII . . . does not set forth 'a general civility code for the American workplace.'"[27]  "'[M]ere utterance of an . . . epithet which engenders offensive feeling in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII."[28]

In determining whether an environment is "hostile," a Court must look at all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is

---

[23]*Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

[24]*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

[25]*Id.* at 21–22.

[26]*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris*, 510 U.S. at 21).

[27]*Burlington No. and Santa Fe Ry. Co. v. White*, ___ S. Ct. ___, 2006 WL 1698953, at *10 (June 22, 2006) (quoting *Oncale*, 523 U.S. at 80 and citing *Faragher v. City of Boca Raton*, 524 U.S. 775,  788 (1998) (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'")).

[28]*Harris*, 510 U.S. at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[29]  "[A] few isolated incidents of racial enmity" are insufficient to support plaintiff's claim; instead plaintiff must show that there was "a steady barrage of opprobrious racial comments."[30]

Defendant points the Court to several cases in which the harassment alleged by the plaintiff was not pervasive enough to be actionable under Title VII.  In *Bolden v. PRC, Inc.*, the Tenth Circuit found that two incidents of racial harassment over a period of eight years of employment was not pervasive harassment.[31]  The Tenth Circuit also held in *Chavez v. New Mexico, et al.*, that two racial comments "fall far short of the 'steady barrage' required for a hostile environment claim."[32]  In another case, the Tenth Circuit found that five separate incidents over a sixteen month period were not sufficiently severe or pervasive to support a claim for hostile work environment.[33]  And a court in this district found that four isolated comments over the course of four years failed to demonstrate the "steady barrage" required to show a hostile work environment.[34]

However, the Tenth Circuit has also cautioned that "while courts have tended to count events over time to determine pervasiveness, the word 'pervasive' is not a counting measure."[35]

---

[29]*Id.* at 22.

[30]*Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (citations omitted).

[31]*Id.*

[32]397 F.3d 826, 832 (10th Cir. 2005).

[33]*Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1366 (10th Cir. 1997).

[34]*Hernandez v. Data Sys. Intern., Inc.*, 266 F. Supp. 2d 1285, 1309 (D. Kan. 2003).

[35]*Smith v. Northwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1414 (10th Cir. 1997).

In determining whether the harassment was pervasive, the court suggests the following:

> The trier of fact utilizes a broader contextual analysis. It begins with the number, sequence, and timing of the conduct. The factfinder then looks at the nuances of an environment that is imposed by each instance of discriminatory behavior.[36]

The court in that case found that while it was a "close question," the record reflected pervasive harassment when plaintiff alleged that her supervisor made three gender-based statements and three comments using profanity during her twenty-three month employment.[37]

In this case, plaintiff has alleged three incidents of racial harassment: (1) Thornton said that a "bunch of niggers" live in plaintiff's neighborhood, (2) Thornton told plaintiff that he had never met an intelligent black person, and (3) Thornton mocked an African American co-worker in front of plaintiff and then asked, "How do you understand those people?" While defendant argues that plaintiff suffered the three incidents over a relatively a short period of time and therefore the harassment was not pervasive, the Court views the time period from a different perspective. The parties admit that plaintiff worked for Thornton for approximately seven weeks, that plaintiff got along with Thornton for two weeks, and that plaintiff was absent from work for three weeks due to an injury. Therefore, plaintiff suffered the harassment for approximately two to three weeks. While a few weeks is a short period of time, three inappropriate comments over this short span of time could amount to pervasive harassment in the eyes of a reasonable jury. The harassment in this case was more concentrated when it occurred in a two to three week period in comparison with the alleged harassment in other Tenth Circuit cases such as *Bolden* in which the harassment occurred over an eight year time period.

---

[36]*Id.*

[37]*Id.*

Additionally, the Court considers the facially neutral acts of harassment of which plaintiff complains, and concludes that a jury may find that plaintiff was subjected to a hostile work environment when considering the facially neutral acts along with the three racial incidents.  "In this circuit, not only may the court consider the overtly discriminatory remarks but also those comments and actions that lack the apparent hallmark of discrimination."[38]  "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus."[39]  "[N]eutral acts may be considered if, coupled with the overtly hostile behavior, they produce an inference of unlawful harassment."[40]  Plaintiff has alleged at least three examples of facially neutral harassment by Thornton that occurred after Thornton learned that plaintiff was married to an African American woman.  These three incidents occurred: (1) when Thornton told plaintiff to shovel while plaintiff was on work restrictions; (2) when plaintiff showed up late to work; and (3) when plaintiff and Bill Cox were participating in the urine analysis.  Taken in the light most favorable to plaintiff, a jury could conclude that these three incidents were acts of harassment committed by Thornton based on plaintiff's marriage to an African American woman.[41]  Therefore, the Court finds that based on the three racial comments made by Thornton coupled with the three examples of facially neutral acts of harassment, a reasonable jury may

---

[38]*Hammad v. Bombardier Learjet, Inc.*, 192 F. Supp. 2d 1222, 1239 (D. Kan. 2002) (citing *O'Shea v. Yellow Tech. Servs. Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)).

[39]*O'Shea*, 185 F.3d at 1097.

[40]*Hammad*, 192 F. Supp. 2d at 1239 (citing *O'Shea*, 185 F.3d at 1097 (citing *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999)).

[41]*See id.* at 1240 (finding that three examples of facially neutral harassment "may be mere workplace shenanigans that are common to defendant's factory but, taken in the light most favorable to plaintiff, may also be acts of harassment based upon plaintiff's race, religion, and/or country of origin.").

find that this harassment was objectively severe or pervasive so as to alter the terms and conditions of his employment.

However, defendant argues that it is not liable for plaintiff's hostile work environment claim because it exercised reasonable care in preventing and correcting the harassing behavior. In determining whether an employer is liable for a hostile work environment created by a supervisor, the Tenth Circuit looks to general agency principles.[42]  An employer may be liable in three situations: "(1) if the conduct violating Title VII occurred within the transgressor's scope of employment; (2) if the employer knew, or should have known about, the violation and failed to respond in a reasonable manner; or (3) if the transgressor acted with apparent authority or was aided in violating the statute by virtue of their agency relationship with the employer."[43]

Under the first basis, "harassment by a supervisor is generally not conduct within the scope of employment" unless "it was motivated by an intent to serve the employer."[44]  In this case, there is no evidence that Thornton engaged in the alleged harassment in order to serve his employer or "'in order to placate the prejudice pervasive in the labor force.'"[45]  "The second basis for liability . . . is employer negligence."[46]  "The employer may be held liable if it knew, or should have known, about the hostile work environment and failed to respond in an appropriate

---

[42]*Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1269 (10th Cir. 1998).

[43]*Id.* at 1269–70 (citing  *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 n.1 (10th Cir. 1994); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 n.3 (10th Cir. 1993)).

[44]*Id.* at 1270 (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 757 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 793 (1998)).  The Tenth Circuit went on to point out that "[a]lthough *Burlington* and *Faragher* involved sexual harassment, the principles established in those cases apply with equal force to this case of racial harassment."  Likewise, such principles apply to this plaintiff's racial harassment case as well.

[45]*Id.* (quoting *Faragher*, 524 U.S. 798).

[46]*Id.*

12

manner."[47]  Under the second scenario for employer liability, "failing to remedy or prevent a

hostile or offensive work environment . . . is premised on direct liability, not derivative liability,

according to the doctrine of respondeat superior."[48]

In this case, defendant had knowledge of the alleged harassment.  "Actual knowledge

will be demonstrable in most cases where the plaintiff has reported harassment to management-

level employees."[49]  Plaintiff reported to Raccuglia one racial incident and other incidents of

facially neutral harassment committed by Thornton, providing his employer with knowledge of

the harassment.  In determining whether an employer's response to the reported harassment was

adequate, a court must ask "whether the remedial and preventative action was 'reasonably

calculated to end the harassment.'"[50]  Reasonable responses include: "prompt investigation of the

allegations, proactive solicitation of complaints, scheduling changes and transfers, oral or written

warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct

could result in progressive discipline, including suspension and termination."[51]  Raccuglia

responded to plaintiff's complaint by verbally reprimanding Thornton.  Raccuglia warned

Thornton that use of such language was prohibited by defendant and that repeated conduct would

result in further discipline, up to and including termination.  Such action by defendant appears to

be reasonable.  However, plaintiff contends that defendant's response was not adequate because

---

[47]*Id.*

[48]*Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1270 (10th Cir. 2000).

[49]*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998) (citing *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir. 1987)).

[50]*Id.* at 676 (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)).

[51]*Id.*

the harassment did not stop.  Indeed, plaintiff admits that Thornton ceased his use of racial epithets after Raccuglia's talk, but plaintiff contends that he was still verbally abused by Thornton through facially neutral harassment, and that this harassment forced him to quit his employment.  Plaintiff complained of this facially neutral harassment to Raccuglia, but there is no evidence in the record that Thornton received further reprimand other than the single conversation between Thornton and Raccuglia.  Viewing all facts in the light most favorable to plaintiff, the Court finds that based on plaintiff's allegations, a reasonable jury could conclude that defendant failed to appropriately respond to plaintiff's complaints, and thus find defendant is directly liable for Thornton's conduct.

Because the Court finds the plaintiff has provided enough evidence that a reasonable jury could find defendant directly liable for the alleged harassment, the Court need not address the third basis for liability.  As shown above, the Court finds that plaintiff has presented sufficient evidence to support a claim for hostile work environment.  Accordingly, the Court must deny defendant's motion for summary judgment on this claim.

### C.  Retaliation

The "anti-retaliation provision" of Title VII "forbids an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."[52]  "The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."[53]  But "[a]n employee's

---

[52]*Burlington No. and Santa Fe Ry. Co. v. White*, ___ S. Ct. ___, 2006 WL 1698953, at *3 (June 22, 2006) (quoting 42 U.S.C. § 2000e-2(a)).

[53]*Id.* at *10.

decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."[54]

To establish retaliation, a plaintiff must show "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[55]

First, plaintiff has shown that he engaged in protected activity under Title VII. "Informal complaints to superiors constitute protected activity."[56]  By complaining to Raccuglia about Thornton's behavior, plaintiff has established the first element of his retaliation claim.  Under the second element, plaintiff must show that a reasonable employee would have found the challenged action materially adverse.  In this case, plaintiff contends that he was constructively discharged.  "'Constructive discharge, like actual discharge, is a materially adverse employment action.'"[57]  "A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign."[58]  "Working conditions must be so severe that the plaintiff simply had no

---

[54]*Id.*

[55]*Argo v. Blue Cross and Blue Shield of Kansas Inc.*, ___ F.3d ___, 2006 WL 1806605, at *7 (10th Cir. July 3, 2006) (citing *Burlington*, 2006 WL 1698953, at *10; *Miller v. Auto Club of New Mexico, Inc.*, 420 F.3d 1098, 1119 (10th Cir. 2005)).

[56]*O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001).

[57]*Rennard v. Woodworker's Supply, Inc.*, 101 Fed. Appx. 296, 308 (10th Cir. 2004) (quoting *EEOC v. Univ. of Chicago Hosp.*, 276 F.3d 326, 331 (7th Cir. 2002)).

[58]*Exum v. United States Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1367 (10th Cir. 1997)).

choice but to quit."[59]  The Tenth Circuit "judge[s] the voluntariness of an employee's resignation under an objective standard, looking to whether his or her working conditions were so intolerable that a reasonable employee would have had no other choice but to quit."[60]

In this case, the Court concludes that even when viewing the facts in the light most favorable to plaintiff, he has failed to establish that he was constructively discharged.  While the objective evidence shows that the conditions of plaintiff's employment under Thornton were not pleasant, the Court concludes that no rational jury would find that a reasonable person would have felt compelled to resign from his employment.  When plaintiff quit his employment, he had suffered three incidents of racial harassment, but these comments had ceased once Raccuglia spoke with Thornton.  While plaintiff alleges that he faced other facially neutral harassment from Thornton, he was subjected to such behavior for only two to three weeks, and he only alleges three such incidents occurred.  Plaintiff freely chose to resign, and there is no evidence that the employer imposed conditions on him that left him with no other choice but to resign.  The Court recognizes that plaintiff testified in his deposition that he started looking for alternative employment in September 2004 because he felt that "nothing [was] getting better" and therefore, he wanted "out of [the] situation."[61]  However, "'plaintiff's subjective views of the situation are irrelevant.'"[62]  Thus, based on the objective evidence, the Court finds that plaintiff was not constructively discharged from his employment.

---

[59]*Id.* (citing *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000); *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997)).

[60]*Id.* at 1135–36 (citing *Yearous*, 128 F.3d at 1356).

[61](Doc. 21; Ex. 1 at 16.)

[62]*Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998)(quoting *Yearous*, 128 F.3d at 1401).

In the alternative, plaintiff argues that he suffered a materially adverse employment action when he was forced to shovel more than other co-workers.  The Supreme Court recently held in *Burlington Northern and Santa Fe Railway Co. v. White* that Title VII's anti-retaliation provision "extends beyond workplace-related or employment-related retaliatory acts and harm" and "protects an individual not from all retaliation but from retaliation that produces an injury or harm."[63]  In order to establish an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination."'"[64]  The Supreme Court "speak[s] of material adversity because [it] believe[s] it is important to separate significant from trivial harms."[65]

"To be sure, reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"[66]  In *White*, plaintiff lodged a sexual harassment complaint with her employer.  Afterwards, plaintiff was removed from her duties as a forklift operator and was reassigned to standard laborer tasks.  Finding that the track labor duties were "more arduous and dirtier" than the fork lift operator position that was "objectively considered a better job," the  Supreme Court held that "a jury could reasonably conclude that the reassignment

---

[63]*Burlington Northern and Santa Fe Railway Co. v. White*, ___ S. Ct. ___, 2006 WL 1698953, at *10 (June 22, 2006).

[64]*Id.* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quoting *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005)).

[65]*Id.*

[66]*Id.* at *12 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

17

of responsibilities would have been materially adverse to a reasonable employee."[67]

In this case, defendant did not officially reassign plaintiff's job duties. Plaintiff contends that he was asked to shovel more than other co-workers. He testified that usually a team of three of four workers would be assigned to shovel the rocks that accumulated underneath the plant. Plaintiff contends that after Thornton learned that he is married to an African American woman, Thornton forced him to shovel, even when he was placed on work restrictions for a shoulder injury. In his deposition testimony, plaintiff presented two incidents in which Thornton asked him to shovel. While shoveling may be a more arduous task than plaintiff's regular duties as a cement truck driver, the Court finds that a couple of occasions in which plaintiff was made to shovel over a two to three week period did not amount to a reassignment of plaintiff's job duties. Further, being asked to shovel on two occasions, even if it was done in a rude manner, does not amount to the type of humiliation arising to the level of an adverse employment action as contemplated by the Tenth Circuit.[68] In *Berry v. Stevinson Chevrolet*, the Tenth Circuit found that plaintiff had suffered an adverse employment action when his employer instituted criminal charges against him.[69] Such criminal charges and the accompanying criminal trial brought "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects."[70] Plaintiff's charge to shovel over a short span of two to three weeks in no way rises to the level of this type of humiliation.

Therefore, the Court concludes that a reasonable jury could not find that Thornton's

---

[67]*Id.*

[68]*Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996).

[69]*Id.*

[70]*Id.*

assignment of plaintiff to shoveling duty over a two to three week span would have been

materially adverse to the reasonable employee.  Accordingly, because plaintiff cannot show that

he suffered an adverse employment action, his claim for retaliation must fail, and summary

judgment is granted in favor of defendant on this claim.

### D.    Racial Discrimination

"To make out a prima facie case of discrimination, [a plaintiff] must demonstrate (1)

membership in a protected class, (2) adverse employment action, and (3) disparate treatment

among similarly situated employees."[71]  The Tenth Circuit counsels that a plaintiff's burden "in

articulating a prima facie case is slight."[72]  Plaintiff's burden is "'not onerous,'" based on the

"'small amount of proof necessary to create [an inference of discrimination.]'"[73]

With respect to the second element, an adverse employment action is "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits."[74]

While the Tenth Circuit liberally defines adverse employment action,[75] the Court has already

explained above that plaintiff has failed to show that he suffered an adverse employment action

by either constructive discharge or by assignment to shoveling duties.  Thus, his claim for racial

discrimination fails, and defendant's request for summary judgment on this claim is granted as

---

[71]*Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citing *Trujillo v. Univ. of Colorado Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998)).

[72]*Id.*

[73]*Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *EEOC v. Flasher Co. Inc.*, 986 F.2d 1312, 1318 (10th Cir. 1992)).

[74]*Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

[75]*Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003).

well.

### E.    Limitation on Damages

Defendant contends that it is subject to the damages limitations of 42 U.S.C.

§ 1981a(b)(3)(B) because it employs fewer than 201 employees.  Under this statutory provision,

a plaintiff's damages for violation of Title VII are limited to $100,000 if the defendant employer

has more than 100 and fewer than 201 employees in each of twenty or more calendar weeks in

the current or preceding year.[76]  To support this argument, Rob Henning, the controller of

defendant company, asserts that beginning June 1, 2004, defendant employed more than 101

persons but fewer than 201 employees through the end of that year.[77]

To rebut this proposition, plaintiff responds that defendant is owned by a parent

corporation, Ash Grove, and that this parent corporation employs more than 500 people.

Initially, the Court notes that "the doctrine of limited liability creates a strong presumption that a

parent company is not the employer of its subsidiary's employees, and courts have found

otherwise only in extraordinary circumstances."[78]  "Federal courts have employed several tests to

determine whether Title VII liability can be imposed on a parent corporation for the actions of its

subsidiaries" including: "(1) whether the two companies are integrated, (2) whether the parent

exercises a significant degree of control over the subsidiary's decisions, (3) whether the parent is

the alter ego of the subsidiary, and (4) whether the parent exercises extensive control over the

---

[76]42 U.S.C. § 1981a(b)(3)(B).

[77](Doc. 24; Ex. 8.)

[78]*Rowland v. Franklin Career Servs., LLC*, 272 F. Supp. 2d 1188, 1200 (D. Kan. 2003) (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980–81 (4th Cir. 1987)); *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1071 n.2 (10th Cir. 1998) (citing *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993)).

acts of the subsidiary with respect to the particular claim of wrongdoing."[79]

Here, plaintiff seeks to impose the integrated enterprise test which requires a court to weigh four factors: "1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control."[80]  Plaintiff offers scant evidence that defendant is an integrated enterprise with Ash Grove.  Plaintiff contends that defendant uses that same employment manual and personnel department as several entities including: Ash Grove Materials Corp., Ash Grove Aggregate, Inc., Century Concrete, Inc., Fordyce Concrete Company, Material Transport Company, Material Packing Company, and Precision Packing Company.  Plaintiff also submits that several of these companies have the same office address as listed by the Secretary of the State of Kansas.  Further, plaintiff alleges that Raccuglia works as the personnel manager for both defendant and Fordyce Concrete company.  Defendant replies that its company is a separate corporation in good standing, and argues that the record in this case lacks evidence to rebut the strong presumption that a parent company is not the employer of its subsidiary's employees.

Here, plaintiff has clearly failed to show the third element of the integrated enterprise test.  "To satisfy the control prong, a parent must control the *day-to-day employment decisions* of the subsidiary."[81]  While the evidence cited by plaintiff establishes "some common management between the two entities," plaintiff has failed to present evidence that a parent company

---

[79]*Rowland*, 272 F. Supp. 2d at 1200–01 (citing *Frank*, 3 F.3d at 1362; *Schmitt v. Beverly Health & Rehab. Servs., Inc.*, 993 F. Supp. 1354, 1358 (D. Kan. 1998)).

[80]*Lockard*, 162 F.3d at 1069 (citing *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1089 (10th Cir. 1991)).

[81]*Id.* at 1070 (citing *Frank*, 3 F.3d at 1362).

controlled the day-to-day employment decisions of defendant, as a subsidiary.[82]  Therefore, the
Court grants summary judgment in favor of defendant with respect to this issue and limits
defendant's damages under 42 U.S.C. § 1981a(b)(3)(B).

### F.    Conclusion

The Court grants in part and denies in part defendant's motion to dismiss.  Plaintiff has
failed to show the existence of a genuine issue of material fact upon which a reasonable jury
could find in his favor as to his claims of retaliation and discrimination under Title VII.
However, the Court finds that plaintiff has provided sufficient evidence of a hostile work
environment to withstand defendant's motion for summary judgment.  Therefore, plaintiff's
hostile work environment claim remains as the only pending claim in this action.  The Court
further finds that plaintiff has failed to put forth evidence that defendant employs more than 201
people.  Therefore, plaintiff's damages are limited to $100,000 in this action.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for
Summary Judgment (Doc. 23) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED**.

Dated this 6th___ day of July 2006.

 S/ Julie A. Robinson
_____

**Julie A. Robinson**
**United States District Judge**

---

[82]*Id.* at 1071; *see also Bristol v. Board of County Comm'rs of County of Clear* 312 F.3d 1213 (10th Cir.
2002) ("[T]he first factor cannot counterbalance the [parent's] complete lack of control over labor relations in the
[subsidiary].").

*Smith v. Century Concrete, Inc.*, No. 05-2105, Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment