ace

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **LARRY SMITH,**               ) | |
|               ) | |
|        **Plaintiff,**      ) | |
|               ) | |
| **vs.**                  ) | |
|               ) | **Case No. 05-2105-JAR** |
| **CENTURY CONCRETE, INC.,**   ) | |
|               ) | |
|        **Defendant.**     ) | |

## <u>MEMORANDUM & ORDER</u>

This matter comes before the Court on post-judgment motions filed by plaintiff and defendant. In this action, plaintiff brought claims under Title VII against his former employer for hostile work environment, retaliation, and disparate treatment. After the Court granted summary judgment on plaintiff's retaliation and disparate treatment claims (Doc. 29), the parties proceeded to trial on plaintiff's hostile work environment claim. At the close of evidence in the trial, defendant orally moved for judgment as a matter of law, and the Court took the matter under advisement. On April 11, 2007, the jury returned a judgment in favor of plaintiff and assessed $6000 in compensatory damages and $25,000 in punitive damages (Doc. 58). Defendant now renews its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) on the issue of punitive damages (Doc. 60). And plaintiff, as the prevailing party, has filed a motion for attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k), Fed. R. Civ. P. 54(d)(2), and D. Kan. R. 54.2 (Doc. 61). For the reasons set forth below, the Court denies defendant's motion and grants plaintiff's request for attorney's fees and costs.

## I.      Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(a)(1), a court may grant a motion for judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."[1]  A moving party "is entitled to a judgment if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position."[2]  "The question is not whether there is literally no evidence supporting the nonmoving party but whether there is evidence upon which a jury could properly find for that party."[3]  In order for a jury to properly find for a party, "more than a scintilla of evidence" must be presented to support a claim.[4]  In considering a motion for judgment as a matter of law, the court reviews all of the evidence in the record and construes it in the light most favorable to the nonmoving party.[5]  But the court must refrain from making credibility determinations and weighing the evidence.[6]  "The jury has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact."[7]

---

[1]Fed. R. Civ. P. 50(a)(1).

[2]*Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (quotations omitted).

[3]*Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 685 (10th Cir. 2007).

[4]*Id.* (citing *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1278 (10th Cir. 2003)).

[5]*Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000); *Deters*, 202 F.3d at 1268).

[6]*Id.*

[7]*See United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1227 (10th Cir. 2000) (internal quotations and citation omitted).

A.      **Facts**

At the outset, the Court recognizes defendant's objections to plaintiff's statement of facts in his response.  Defendant takes issue with plaintiff's failure to provide proper citation to the record to support his statement of facts and plaintiff's improper insertion of argument into this section of his response.  The Court is also troubled by plaintiff's lack of citation to the record and inappropriate use of argument in setting forth his statement of facts.  Plaintiff's response has made this Court's job more difficult by requiring it to sift through plaintiff's statement of facts, separating argument from fact, and then thoroughly searching the record for proper support. While defendant states that all of its facts are uncontroverted, the Court will not deem them as such.  The present matter before the Court is a motion for judgment as a matter of law, rather than a motion for summary judgment that requires a party to submit a statement of facts in numbered paragraphs referring with particularity to those portions of the record on which the party relies.[8]  Therefore, in this motion for judgment as a matter of law, the Court does not rely on the uncontroverted facts presented in defendant's motion and reply, but instead the Court, after thoroughly reviewing the record, determines that the facts set forth below are based on the evidence presented at trial.  In so doing, however, the Court does not excuse plaintiff's sloppy submissions to the Court and suggests to counsel to refrain from such practices in the future.

The following facts are based on the evidence presented at trial and are viewed in the light most favorable to plaintiff.  Plaintiff is a white male, who was employed by defendant as a driver of a concrete truck.  Plaintiff is married to an African-American woman, and the couple have biracial children.  Plaintiff presented evidence at trial that during his employment with

---

[8]D. Kan. R. 56.1

defendant, he suffered harassment based on his association with a person of another race, which he perceived as abusive, by his supervisor, Matt Thornton.

### 1.      Harassment

In or about the second week of August 2004, Thornton became the plant manager at defendant's facility in Edwardsville, Kansas and began supervising plaintiff. Plaintiff initially got along well with Thornton. About a week later, Thornton asked plaintiff where he lived. Plaintiff told Thornton his address, and Thorton asked if a "bunch of niggers" live around there. Plaintiff told Thornton that he was offended by his words because he is married to an African-American woman and his children are biracial. The following day, Thornton approached plaintiff and told him to get a "fucking shovel" and to start shoveling. Plaintiff explained to Thornton that he was on work restrictions for an injury, and Thornton told him to use his other "fucking arm." Plaintiff testified that during this incident, Thornton was very angry and close to his face.

Sometime later, plaintiff and another coworker, Bill Cox,[9] were selected to participate in a random urine analysis. While both men were waiting to submit their samples, Thornton asked them, "what's the fucking problem?" Thornton stated that he was dealing with a bunch of kids who couldn't even "take a piss." Plaintiff testified that Thornton "came at them aggressively." On another occasion, Thornton mocked an African-American coworker and asked plaintiff how he understood "those people." Thornton also called plaintiff a "nigger-lover."[10] On another day,

_____

[9]Plaintiff incorrectly referred to him as Bob Cox.

[10]On cross-examination, defendant attempted to impeach plaintiff's testimony by showing that he had not previously alleged this particular racial statement. Plaintiff never mentioned it in his deposition answers. Also, it is not referenced in plaintiff's notes that he took contemporaneously with the harassment. (Ex. 405.) However, plaintiff testified at trial that this incident occurred and that he was mistaken for not mentioning it earlier.

plaintiff was twenty or thirty minutes late to work.  Thornton told plaintiff that he was to be there at a "certain fucking time" and that plaintiff needed to "get his ass" to work on time.  Plaintiff testified that during this conversation, Thornton was aggressive and "in his face."

### 2.    Defendant's Response

During the relevant time period, defendant had a written policy prohibiting harassment.  This policy was contained in its employee handbook.  Plaintiff signed for and received a copy of this handbook, but plaintiff testified that he never received any training for racial harassment and discrimination.

There was conflicting evidence presented at trial regarding the number of complaints that plaintiff made to defendant and defendant's response to those complaints.  Plaintiff testified that he first complained to defendant's operation manager, Jay Raccuglia, after the shoveling incident.  At that time, he told Raccuglia that Thornton was cussing at him and ordering him to shovel when he was on work restrictions.  Plaintiff also told Raccuglia about Thornton's statement that a "bunch of niggers" live in plaintiff's neighborhood.  The following day, Raccuglia visited the plant and spoke with Thornton.  But plaintiff testified that Thornton's treatment of him did not get better after that because he would still cuss at him and order him to shovel while on restrictions.  Plaintiff testified that he also complained to Raccuglia about Thornton's comments during the urine analysis and Thornton's mocking of an African-American coworker.[11]  Plaintiff stated he talked to Raccuglia "several times" about what was going on at

---

[11]On cross-examination, defendant attempted to impeach plaintiff with his deposition answers in which he stated that he never complained to Raccuglia about the mocking incident.  Also, plaintiff testified in his deposition that this mocking incident occurred before plaintiff made any complaints to Raccuglia.  His deposition testimony is also supported by the notes that he took contemporaneously with the harassment.  (Ex. 405.)  Plaintiff further testified in his deposition that once he complained to Raccuglia, there were no more racial statements made by Thornton.  However, at trial, plaintiff testified that the mocking incident occurred after he made his first complaint to

the plant, and that every time he had an incident with Thornton, he would call Raccuglia to report it. Plaintiff estimated that he made at least three to five complaints to Raccuglia about Thornton's conduct. However, plaintiff testified that nothing changed after his complaints.

Raccuglia testified that he received one complaint from plaintiff regarding racial harassment by Thornton. Raccuglia stated that plaintiff called him and reported that Thornton had used the "n-word" in a conversation, but plaintiff did not complain to Raccuglia that Thornton used the word, "nigger lover," or that Thornton had mocked an African-American employee. Raccuglia told plaintiff that he would talk to Thornton about the allegation. The next day, Raccuglia went to the plant to meet with Thornton, who admitted that he had used the racial slur. Raccuglia told Thornton that such language was not acceptable under company policy, and he issued a verbal warning, the first step in the company's progressive discipline policy. Raccuglia also told Thornton that he was not to retaliate against plaintiff and that if he used such language again, the company would continue applying the progressive discipline policy up to and including termination. Raccuglia testified that when he was leaving the plant, he told plaintiff that he had taken care of the problem, but that plaintiff should contact him if there were any more incidents.

According to Raccuglia's testimony, he next received a complaint from plaintiff regarding the incident when plaintiff was late to work. Plaintiff complained to Raccuglia that he was being treated like a kid and that Thornton used foul language. Plaintiff did not tell Raccuglia that this incident was racially motivated or that Thornton had been "in his face."

---

Raccuglia, and that he complained about the mocking incident. Plaintiff also admitted, though, that he may be confused about the timing since the relevant facts occurred three years ago. Plaintiff testified that his notes were the most accurate version of the facts.

When Raccuglia spoke with Thornton about the incident, he stated that he was upset with plaintiff for showing up late to work because without plaintiff to serve as the loader, the plant literally comes to a stop.  Raccuglia then contacted plaintiff and reported the findings of his investigation.  Raccuglia did not act further on plaintiff's complaint because, to his knowledge, the incident was merely a verbal confrontation over plaintiff's tardiness.

Raccuglia next testified that rather than plaintiff complaining about the shoveling incident, he received a call from the plant supervisor complaining that plaintiff would not perform shoveling duties.  Raccuglia in turn called plaintiff, who was upset because he was told to shovel while on light duty and that he was talked to in an inappropriate way.  Raccuglia checked on plaintiff's work restrictions and learned that at that time, plaintiff had been released to full duty.  But Raccuglia called plaintiff back and told him that if he was hurting at work, he should go see the doctor again, which plaintiff did and went back on work restrictions.  Plaintiff also told Raccuglia that a coworker, Jason Naylor, had observed the shoveling incident.  When Raccuglia had a conversation with Naylor about the shoveling incident, he did not recall the incident or he was unaware of it.[12]  Finally, with regard to the urine analysis incident, Raccuglia testified that plaintiff never made a complaint about that incident to him.

### B.    *Hostile Work Environment Claim*

At the close of evidence in the trial, defendant orally moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), and the Court took the matter under advisement for determination after the jury reached a verdict.  Defendant has since filed a Renewed Motion for

---

[12]Plaintiff raises an objection to this fact based on hearsay.  As explained at trial, this statement is not hearsay because it is not offered to the prove the truth of the matter asserted, rather it is offered to explain why Raccuglia acted in a certain manner.  Further, this fact was admitted into evidence at trial.

Judgment as a Matter of Law pursuant to Fed. R. Civ. P. 50(b) in which defendant only argues the punitive damages issue.[13]  To the extent defendant has not withdrawn his motion for judgment as a matter of law on plaintiff's hostile work environment claim, the Court will address this issue because the Court has yet to rule on defendant's oral motion for judgment as a matter of law.

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."[14]  To succeed on a claim of a hostile work environment, plaintiff must establish that "'that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and that the victim 'was targeted for harassment because of [his] . . . race . . . .'"[15]

In this case, plaintiff testified to a number of incidents in which Thornton harassed plaintiff, the harassment was abusive, and it was based on plaintiff's association with a person of another race.[16]  While plaintiff's testimony at trial contradicted his previous deposition testimony, the jury heard about several racial statements made by Thornton.  The jury also learned from plaintiff that he suffered several incidents of facially neutral harassment but that

---

[13](Doc. 60 at 1; Doc. 63 at 8.)

[14]42 U.S.C. § 2000e-2(a)(1).

[15]*Herrera v. Lufkin Indust., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326–27 (10th Cir. 2004)).

[16]The Court ruled in its summary judgment order that plaintiff, as a white male, could bring a claim based on associational discrimination, specifically discrimination based on his marriage to an African-American woman. (Doc. 29 at 7.)

plaintiff believed that these incidents were based on plaintiff's marriage to an African-American woman.  Despite the inconsistencies in plaintiff's testimony, it was within the jury's province to determine the credibility of that testimony.  Viewing this evidence in the light most favorable to plaintiff, a reasonable jury could find, based on plaintiff's testimony, that plaintiff was subjected to a hostile work environment, as the jury apparently concluded in this case.

But defendant argues that even if plaintiff was subjected to a hostile work environment by Thornton, defendant cannot be held liable when its response to the harassment was reasonable.  In determining whether an employer is liable for a hostile work environment created by a supervisor, the Tenth Circuit looks to general agency principles.[17]  An employer may be liable in three situations: "(1) if the conduct violating Title VII occurred within the transgressor's scope of employment; (2) if the employer knew, or should have known about, the violation and failed to respond in a reasonable manner; or (3) if the transgressor acted with apparent authority or was aided in violating the statute by virtue of their agency relationship with the employer."[18]

In this Court's Memorandum and Order granting in part and denying in part defendant's motion for summary judgment, the Court concluded that there was sufficient evidence to proceed to trial under the second situation, a direct liability theory.  Under the second scenario for employer liability, "failing to remedy or prevent a hostile or offensive work environment . . . is premised on direct liability, not derivative liability, according to the doctrine of respondeat superior."[19]

---

[17]*Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1269 (10th Cir. 1998).

[18]*Id.* at 1269–70 (citing  *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 n.1 (10th Cir. 1994); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 n.3 (10th Cir. 1993)).

[19]*Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1270 (10th Cir. 2000).

"The second basis for liability . . . is employer negligence."[20]  "The employer may be held liable if it knew, or should have known, about the hostile work environment and failed to respond in an appropriate manner."[21]

In the summary judgment order, after concluding that there was sufficient evidence of direct liability to survive summary judgment, the Court declined to address a theory of vicarious liability under the third scenario.  Under that scenario, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."[22]  However, under this theory, a defendant can avoid liability by showing: "(a) that the employer exercised reasonable care to prevent and correct promptly any [] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."[23]  At trial, the jury was instructed of this defense.[24]

After reviewing the record, plaintiff's testimony regarding the number of incidents of harassment and whether or not he reported such incidents is less than clear.  However, plaintiff testified that he is only human and that he had trouble remembering incidents that occurred several years ago.  Plaintiff also testified that he reported incidents to Raccuglia on "several

---

[20]*Wright-Simmons*, 155 F.3d at 1270.

[21]*Id.*

[22]*Id.* at 1271.

[23]*Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)).

[24](Doc. 55 at 23 (Instruction No. 20).)

occasions," approximately three to five times.  Plaintiff further testified that after his complaints, the situation did not improve.  Defendant relies heavily on Raccuglia's recitation of the facts, including the number of incidents that were reported to him and the reasonable efforts that he made to investigate and respond to the matter.  However, it is not the Court's province to weigh the evidence nor evaluate the credibility of plaintiff's somewhat conflicting testimony.  It would be reasonable for the jury to disregard Raccuglia's testimony,[25] and instead rely on plaintiff's version of the facts.  The jury's verdict represents their evaluation of the evidence, and having considered the entire record, this Court finds that there was sufficient evidence, based on plaintiff's testimony, for the jury to determine that plaintiff made reasonable efforts to complain about the harassment so that defendant had knowledge of it, and that defendant failed to take corrective action, thereby establishing liability based on either a direct or vicarious theory.  Accordingly, there was sufficient evidence presented by plaintiff to support the jury's verdict in his favor on the hostile work environment claim.  Therefore, the Court concludes that judgment as a matter of law is inappropriate on this claim, and defendant's motion is denied.

### C.     Punitive Damages

In its renewed motion for judgment as a matter of law, defendant argues that plaintiff

---

[25]Plaintiff boldly asserts that Raccuglia lied on the witness stand, and therefore the jury may have inferred that all of his other testimony was not worthy of belief.  During Raccuglia's cross-examination, he was asked whether Thornton made other racist statements, and Raccuglia stated not to his knowledge.  Defendant contends that Raccuglia's testimony referred to other racial incidents while plaintiff was employed by defendant.  Plaintiff then introduced evidence that in or around October 2004, when plaintiff was no longer working for defendant, Raccuglia learned that Thornton had made another racial remark in the work place.  Based on this allegation, defendant suspended Thornton from work for ten days without pay.  While Raccuglia may have been mistaken during his testimony regarding the scope of the question as to other racial statements made by Thornton, the jury was tasked with the function of determining the weight and credibility of Raccuglia's testimony, and this Court will not speculate as to their conclusions.

failed to provide evidence to support an award of punitive damages.[26]  A plaintiff, who brings a claim under Title VII, may recover punitive damages if the plaintiff shows that the employer "engaged a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights" of the plaintiff.[27]  "To satisfy this standard, an employer must have acted in the face of a perceived risk that its actions would violate federal law."[28]  This standard is "a more demanding standard than that required for a finding of ordinary liability."[29]

In cases premised on a theory of direct liability, punitive damages are warranted when an employer maliciously or recklessly fails to remedy a hostile work environment of which management employees knew or should have known.[30]  In vicarious liability cases, an employer may avoid an award of punitive damages "if the manager's challenged actions were contrary to the employer's good-faith effort to comply with Title VII."[31]  In this case, plaintiff proceeded to trial on both theories—direct and vicarious liability.

While it is unknown as to which theory the jury found defendant liable to plaintiff, the jury was instructed by this Court as to the elements necessary to establish punitive damages and awarded plaintiff $25,000 in punitive damages, apparently concluding that defendant acted with

---

[26]At trial, defendant objected to the inclusion of a punitive damages instruction.  The Court overruled that objection, and included a punitive damages instruction.  (Doc. 55 at 26 (Instruction No. 23).)

[27]42 U.S.C. § 1981a(b)(1).

[28]*Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007) (citing *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1136 (10th Cir. 2006)).

[29]*Id.*

[30]*Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1270 (10th Cir. 2000).

[31]*Harsco*, 475 F.3d at 1189 (citing *Kolstad v. Am. Dental Ass'n*, 572 U.S. 526, 545–46 (1999)).

malice or reckless indifference.  Defendant points to the testimony of Raccuglia, but the jury may have disregarded his account of the number of complaints that he received from plaintiff and the investigations that he conducted in response to the complaints.  Rather, the jury may have accepted the testimony of plaintiff that he reported incidents on "several occasions" but that "nothing changed."  While some of this testimony was contradicted at trial, plaintiff did testify that he complained to Raccuglia about the shoveling incident and Thornton's statement about plaintiff living near "a bunch of niggers;" about Thornton's comments during the urine analysis; and when Thorton mocked an African-American coworker.  Plaintiff testified that he did not see a response from defendant after he complained, and the only evidence at trial of any discipline leveraged on Thornton was the issuance of the verbal warning.  Therefore, viewing the evidence in the light most favorable to plaintiff, based on plaintiff's version of the facts, it was reasonable for the jury to infer that defendant acted with malice or reckless indifference in failing to respond to plaintiff's complaints of harassment.  Accordingly, the Court denies defendant's motion for judgment as matter of law with respect to the jury's award of punitive damages.

## II.    Attorney's Fees and Costs

Under Title VII, a court has discretion to allow a prevailing party to recover reasonable attorney's fees as part of the costs.[32]  A prevailing plaintiff in a Title VII action is "ordinarily to be awarded attorney's fees in all but special circumstances."[33]  Defendant does not dispute that plaintiff is the prevailing party under the statute, and thus, the Court will grant plaintiff's motion for attorney's fees and costs.

---

[32]42 U.S.C. § 2000e-5(k).

[33]*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 417 (1978).

However, plaintiff has failed to provide the Court with adequate records or information necessary for it to determine the reasonable attorney's fees and expenses associated with bringing this action.  In plaintiff's motion, he requests fees in the amount of $48,750 and costs in the amount of $400 "as more fully documented in the timesheets attached hereto."  But there were no attachments nor any supporting memoranda filed with his motion.  The applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates.[34]  To satisfy its burden, therefore, the party must submit "meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks."[35] Additionally, the local rules require that "the moving party shall file . . . a memorandum setting forth the factual basis for each criterion which the court is asked to consider in making an award. . . . The memorandum shall be supported by time records, affidavits, or other evidence."[36] Accordingly, the Court defers consideration of the amount of plaintiff's attorney's fees and expenses until he has complied with the standards for fee applications as set forth by the Tenth Circuit and this Court.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Judgment as a Matter of Law (Doc. 60) is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff's Motion for Attorney's Fees and Costs (Doc. 61) is **GRANTED.**  Plaintiff shall submit detailed billing records, affidavits, and

---

[34]*Case v. Unified Sch. Dist. No. 233*, 157 F.3d 1243, 1249–50 (10th Cir. 1998).

[35]*Id*. at 1250 (citation omitted).

[36]D. Kan. R. 54.2.

14

supporting evidence **on or before June 11, 2007**; defendant's counsel shall have ten (10) days from the date of submission to respond.

**IT IS SO ORDERED**.

Dated this 30<u>th</u> day of May 2007.

 S/ Julie A. Robinson

Julie A. Robinson
United States District Judge

Memorandum & Order, *Smith v. Century Concrete, Inc.*, No. 05-2105-JAR